**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GIMAEX HOLDING, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPARTAN MOTORS USA, INC., | ) | |
| f/k/a CRIMSON FIRE, INC., | ) | C.A. No. _____ |
| | ) | |
| Defendant, | ) | |
| | ) | |
| SPARTAN-GIMAEX | ) | |
| INNOVATIONS, LLC, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

**VERIFIED COMPLAINT**

Plaintiff Gimaex Holding, Inc. ("Gimaex" or "Plaintiff"), by and through its undersigned

counsel, upon knowledge as to itself and information and belief as to all other matters, alleges for

its Verified Complaint against Defendant Spartan Motors USA, Inc., formerly known as Crimson

Fire, Inc. (collectively, "Spartan USA") as follows:

**NATURE OF THE ACTION**

1.     Gimaex and Spartan USA formed a joint venture, Nominal Defendant Spartan-

Gimaex Innovations, LLC ("Spartan-Gimaex" or the "Joint Venture"), a Delaware limited

liability company, in which they are the sole members.   Spartan USA is a wholly owned

subsidiary of Spartan Motors, Inc. ("Spartan Motors," together with Spartan USA, "Spartan").

2.     The purpose of creating the Joint Venture was to combine the complementary

skills, technologies, resources, capabilities and product portfolios of Gimaex and Spartan USA,

as well as to develop, manufacture and distribute innovative products to fire service markets in

North America, South America, Asia and Europe.

3.      However, after over two years, and the Joint Venture failing to achieve any of its projected goals due to Spartan USA's misconduct and violations relating to the Joint Venture, the parties jointly agreed to dissolve the Joint Venture.

4.      As such, the remaining and sole purpose of the Joint Venture is to wind down, liquidate and dispose of the Joint Venture's assets.  The parties, however, are deadlocked regarding how to liquidate the Joint Venture's assets and wind down.  There is no procedure in the Venture Agreement for Spartan-Gimaex Innovations, LLC (the "Agreement")[1] or otherwise in place for resolving such a deadlock.  Gimaex brings this action for the judicial appointment of a trustee or receiver over Spartan-Gimaex to break the deadlock, liquidate the Joint Venture's assets, and wind down the Joint Venture.

5.      Additionally and as set forth below, Gimaex seeks damages for, *inter alia*, Spartan USA's willful, deliberate and bad faith breaches of the Agreement.

## THE PARTIES

**A.      Plaintiff**

6.      Gimaex is a Florida corporation having its principle place of business at 3801 PGA Boulevard, Suite No. 1001, Palm Beach Gardens, Florida.

7.      Gimaex is a 50% member of the Joint Venture.

8.      Gimaex is a leading manufacturer of firefighting apparatus, and it specializes in the development, planning and construction of special fire extinguishing systems.

**B.      Defendant**

9.      Upon information and belief, Spartan USA is a South Dakota corporation having a registered office at 1828 Freedom Rd., Lancaster, Pennsylvania and a principal place of

---

[1] A true and correct copy of the Agreement is attached hereto as Ex. 1.  Capital terms not defined herein shall have the same meaning given to them in the Agreement.

business at 907 7th Avenue North, Brandon, South Dakota.  Under the Agreement, Spartan USA is listed as having a principal office at c/o Spartan Motors, Inc., 1541 Reynolds Road, Charlotte, Michigan.

10.     Spartan USA is a 50% member of the Joint Venture.

11.     Upon information and belief, Spartan USA is a manufacturer and distributor of fire trucks and other emergency rescue vehicles, and it is a wholly owned subsidiary of Spartan Motors.

**C.     Nominal Defendant**

12.     Spartan-Gimaex is a Delaware limited liability company having its principal place of business at c/o Spartan Motors, Inc., 1541 Reynolds Road, Charlotte, Michigan.  Spartan-Gimaex has a registered agent and registered office at c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware.

13.     Spartan-Gimaex was engaged in the business of developing, manufacturing and distributing innovative products to fire service markets in North America, South America, Asia and Europe.

**D.     Non-Party Spartan Motors**

14.     Upon information and belief, non-party Spartan Motors is a Michigan corporation with a principal office at 1541 Reynolds Road, Charlotte, Michigan.

15.     Upon information and belief, Spartan Motors specializes in the design, engineering and manufacturing of specialty chassis and vehicles, truck bodies and aftermarket parts for the recreational vehicle, emergency response, government services, defense, and delivery and service markets.

16.     Upon information and belief, Spartan Motors has four wholly owned subsidiaries: Spartan Motors Chassis, Inc.; Spartan USA; Crimson Fire Aerials, Inc. ("Crimson Fire Aerials"); and Utilimaster Corporation.

17.     Upon information and belief, Spartan ERV (Emergency Response Vehicles) is a business unit and trade mark of Spartan Motors, focused on the manufacture of custom fire trucks and other rescue vehicles.  The operations of Spartan Motors, together with operations of Spartan USA and Crimson Fire Aerials, make up Spartan ERV.

## JURISDICTION AND VENUE

18.     This Court has original diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there exists complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of $75,000.00.

19.     Under the terms of the Agreement, the parties agreed that the Agreement and the rights of the parties "shall be interpreted in accordance with the laws of the State of Delaware, and all rights and remedies shall be governed by such laws."  *See* Ex. 1 (Agreement) at ¶ 13.09. The parties further agreed "to submit to the exclusive jurisdiction and venue of the United States District Court, District of Delaware, in connection with any claim or controversy arising out of this Agreement." *Id.*

20.     Spartan USA is subject to the jurisdiction of this Court because it purposely availed itself of the benefits and protection of Delaware by agreeing that this Court would have "exclusive jurisdiction" to resolve any litigation arising out of the Agreement.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, among other things, a substantial part of the events or omissions giving rise to the claims

occurred in this judicial district, Spartan-Gimaex resides in this judicial district, and Defendant is subject to this Court's personal jurisdiction.

## FACTUAL BACKGROUND

### A.    Formation and Management of the Joint Venture

22.    On or around November 8, 2012, Gimaex and Spartan USA executed the Agreement, thereby creating Spartan-Gimaex.  Gimaex and Spartan USA each have a 50% ownership interest in Spartan-Gimaex.  *See* Ex. 1 (Agreement), at Exhibit A.

23.    Gimaex and Spartan USA formed Spartan-Gimaex to develop, manufacture and distribute emergency response vehicles in both domestic and international markets.  As one of the world's leading manufacturers of fire apparatus, Gimaex was to (and did in fact) provide its innovative technology for fire extinguishing systems to Spartan USA to incorporate in its fire vehicles and market in North America, South America, Asia and Europe.

24.    Under the Agreement, management of the Joint Venture was vested in the Board of Directors, which is composed of eight (8) individuals, four (4) of whom were designated by Gimaex and four (4) of whom were designated by Spartan USA ("Board of Directors").  *See* Ex. 1 (Agreement) at ¶ 5.01(b).

25.    The directors designated by Gimaex were Louis Devaleix, Phillippe Mis, Gregory Mis and Bernard Peter.  These persons presently serve on the Board of Directors of the Joint Venture.

26.    The directors originally designated by Spartan USA were Dennis Schneider, Lori Wade, Thomas Kivell and Joseph Volk, all of whom are (or were) the senior executives at Spartan USA and/or Spartan Motors.

27.     When the Joint Venture was formed, Dennis Schneider ("Schneider"), former President of Spartan Motors, was elected to perform the duties of the Managing Director for the Joint Venture.  *Id.* ¶ 5.02(b).  On or around March 2014, Schneider ceased being employed by Spartan Motors and resigned as the Managing Director of the Joint Venture.

28.     Due to internal turmoil and changes in the executive management of Spartan, the directors appointed by Spartan USA to the Board of Directors continued to change after the resignation of Schneider.  For example, after Schneider left Spartan Motors, Spartan USA appointed Ken Turner ("Turner") to serve as the Managing Director of the Joint Venture on or around December 2013.  However, upon information and belief, Turner resigned in or around late 2014.  Likewise, Joseph Volk ("Volk"), who also served on the Board of Directors and was the former General Manager of Spartan ERV, resigned in or around December 2013.   Despite the Agreement requiring Spartan to provide notice of any changes to its designated Board of Directors, Spartan often failed to provide Gimaex with notice of such changes.  As a result, Gimaex is uncertain at this time as to whom Spartan has designated as representing its interest on the Board of Directors for the Joint Venture.

29.     The Board of Directors has the sole and exclusive right, power and authority to conduct, supervise and manage the business and affairs of the Joint Venture.  *Id.* ¶ 5.01(a).

30.     Under the Agreement, certain decisions and actions require unanimous approval of the Board of Directors, including, but not limited to, the following: (1) "Any matter that at least one Director of each Class agrees is reasonably likely to have a material adverse impact on the [Joint] Venture's assets or business prospects; (2) "Any Disposition of the property or assets of the [Joint] Venture (or any interest therein), other than in the ordinary course of business of the [Joint] Venture…."; (3) approving or amending in any material fashion a Project Plan and (4)

"Doing or permitting to be done any act or thing whereby the [Joint] Venture may be wound up (whether voluntarily or compulsorily)."  *Id.* ¶ 5.06.

### B.       The Joint Venture's Business and Projects

31.     Upon the formation of the Joint Venture, the parties initially agreed to the development of certain projects.  Specifically, the parties agreed to the following projects: (1) Telstar Telescopic Articulated Platform ("Telstar") Project; (2) RXO Project; (3) Extruded/Glued Body Technology Project; and (4) Light Duty/Price Point Aerial Project (the "MPA Project"). *Id.* ¶ 3.01.  The Board of Directors subsequently approved another project, which involved the development and manufacture of the Emergency Response Platform on Demand (the "POD Project") (collectively, "Joint Venture Projects").

32.     The parties further agreed that Spartan USA and Gimaex would "proceed with diligence to provide the services and materials required of them and will continuously support the Project, subject to the terms and conditions of the related Project Plan." *Id.* ¶ 3.01(d).

33.     As set forth below, although Gimaex performed its duties under the Agreement, and exercised diligence in the development of the Joint Venture Projects, Spartan USA failed to provide the services and materials required of it under the project plans.

34.     Under the Agreement, Gimaex and Spartan USA further agreed that they would each incur and bear their own costs in the development of the Joint Venture Projects until the completion or the termination of each Project Plan, at which time "each Venturer [would] bear[] fifty percent (50%) of the total Costs incurred by both Venturers during such development phase." *Id.* ¶ 6.02.

35.     In developing the Joint Venture Projects, Gimaex incurred a total cost of $4,191,486.61.  Specifically, and as detailed further below, Gimaex incurred the following costs

for each project:  (1) Telstar Project: $888,068.81; (2) MPA Project: $1,804,642.27; (3) RXO Project: $570,131.15; and (4) POD Project:  $344,028.77.  In addition, Gimaex incurred costs in the amount of $584,615.60 for the management and development of the Joint Venture.

   *(a)     The Telstar Project*

36.     The Telstar Project entailed the manufacture and distribution of an emergency response apparatus having a 138-foot telescopic and articulated aerial platform and a custom chassis compliant with requirements and standards of the North American markets and other countries that utilize the National Fire Protection Association ("NFPA") standards.  The Telstar would be marketed under the Spartan ERV brand name.

37.     The Telstar offered several industry-leading features, including the proven Gimaex 138-foot aerial device and turntable and the Spartan Gladiator custom cab and chassis, with a torque box frame for strength and stability.

38.     The Telstar set a new global standard for aerial performance and competed with only two other platforms of its kind available in the United States: the Pierce Manufacturing Bronto Skylift, with a 116-foot articulating platform; and the Rosenbauer American T-Rex All-Purpose Aerial, with a 115-foot articulating platform.

39.     Under the project plan, Gimaex would provide a complete aerial apparatus with a working height of 138-foot that was NFPA compliant and could be integrated on a Spartan ERV chassis.  Spartan USA, on the other hand, would provide the custom chassis and would be responsible for building the Telstar in Spartan's facility in Ephrata, Pennsylvania, due to the vehicle size, weight and testing requirements.

40.     The volume projection for the Telstar was one (1) unit in 2012, with an estimated market of eight (8) units per year by 2013, and a value at approximately $1.3 million per unit.

41.     In or around late 2011, Gimaex developed and manufactured a 138-foot telescopic and articulated aerial platform to meet the structural and mechanical specifications of the Spartan Gladiator custom cab and chassis.

42.     On or around January 15, 2012, Gimaex provided Spartan USA with the aerial device and turntable for use in the Telstar.

43.     The first Telstar prototype unit was completed on or around April 10, 2012.

44.     On or around April 19, 2012, the Telstar was introduced at a Spartan press conference conducted at the Fire Department Instructors Conference ("FDIC") in Indianapolis, Indiana.

45.     As the first of its kind and as is common with prototypes, the Telstar prototype had a few technical issues arise during demonstrations, which were remedied by Gimaex's engineers.  In or around late 2012, the Telstar prototype was in full working condition and available for sale.

46.     Spartan USA has a network of dealers in North America, which are focused on the promotion and sale of Spartan products to fire departments throughout North America.  As such, Spartan USA was responsible for marketing and selling the Telstar in the North American markets.  However, due to its internal discourse and instability, Spartan USA failed to allocate time or resources to the promotion of the Telstar, and it failed to exercise diligence in the marketing and sale of the Telstar as required under the Agreement.

47.     For over a year, the Telstar prototype was complete and available for sale. Yet, Spartan's dealers were not aware of the Telstar's full functions and capabilities, and Spartan never actually tried to sell the Telstar.  Indeed, at a meeting held on December 10-12, 2013 by

Gimaex with Spartan's top dealers in Jupiter, Florida, many of Spartan's dealers stated that they did not know about the Telstar or its capabilities.

48.     Although the Telstar Project was failing because it was not marketed as required by Spartan USA, Gimaex still believed in the quality and capabilities of the Telstar and the need for such a product in the marketplace.  Gimaex continued to promote the Telstar in the North American markets.  On or around August 2014, even with the Joint Venture failing, Gimaex was informed by a third-party dealer in Canada that he had a customer interested in purchasing the Telstar, without any modifications, for approximately $1 million.  Although Spartan USA originally agreed to sell the Telstar, two days prior to the sale, Spartan USA backed out of the agreement because it did not want to upset its own dealer in Canada, as the dealer with the interested customer was not a Spartan dealer.   Thus, the Joint Venture lost this sale and the opportunity to get the Telstar on the market.

49.     The Telstar prototype is currently in the possession of Spartan USA.   Upon information and belief, the Telstar prototype is located at Spartan USA's Ephrata, Pennsylvania facility.  The Telstar prototype has a book value of approximately $1,095,000.

*(b)*     ***The RXO Project***

50.     The RXO Project entailed the design and development for manufacture and distribution of a crossover pumper, having the following features:  (a) a Renault Trucks Defense SAS ("Renault") Midlum 4x4 CCF chassis; (b) Gimaex body providing storage projects; (c) Gimaex CAFS system; and (d) an option pumping configuration.

51.     The RXO would be able to fulfill both structural and wild land fire needs, as well as withstand the winds and forces of a hurricane.  The RXO was to be primarily marketed in

North America and other countries that desire a North American-looking product that is North American compliant.

52.     Under the Project Plan, Spartan USA was to obtain the base non-USA compliant chassis from Renault and modify it as required to resell to Spartan's emergency response original equipment manufacturer partners and Spartan's emergency response customers in Mexico, United States and Canada.  Gimaex was to provide the body design and technical support for the RXO, and Renault/SER would resell the compliant chassis to the other non-emergency response customers.  Spartan USA would provide all sales support for the RXO Project, including information for product information for brochures, specifications, pricings and sales support information.  *See* Ex. 1 (Agreement) at Exhibit D.

53.     The chassis assembly was to be completed at Spartan USA's facilities in Charlotte, North Carolina.

54.     At the time the project commenced, the parties estimated that, given the market, the Joint Venture would be able to sell by 2015 approximately 300 units per year to non-emergency vehicle customers, generating $12,500 royalty per unit.

55.     Under the Agreement, the expenditures for the RXO Project were only approved with respect to the initial evaluation phase of the RXO Project, and Board of Directors approval was required before any significant expenditures were made by either Spartan, Gimaex or the Joint Venture with respect to this project.  *See* Ex. 1 ("Agreement") at Exhibit D.

56.     Gimaex performed a great amount of work on the RXO Project, and it directly incurred significant costs relating to this project.   For example, in order to validate the project and technology, as well as demonstrate it in the United States, Gimaex purchased a chassis from Renault and built a full truck in Europe.  After completion, Gimaex brought the RXO prototype

to the United States for demonstration. These expenditures incurred by Gimaex were approved by the Joint Venture and its Board of Directors.

57. The RXO prototype was demonstrated in North America, and received positive feedback, except it was critiqued by some for its European-styled body work. After validating that there was a market for the RXO in North America, but the costs would be significant to develop an American-styled RXO, Spartan and Gimaex decided to enter into a separate agreement with Renault for the further development of the RXO.

58. As such, on or around December 19, 2012, a letter of intent was executed by Renault, Spartan, Gimaex and the Joint Venture for the further development of the RXO Project (the "Letter of Intent").

59. Under the Letter of Intent, any expenses and costs incurred for further development of the RXO would be borne by each party separately.

60. Nonetheless, on December 19, 2014, Spartan USA sent an invoice to Gimaex for $79,251.81 for "engineering charges for RXO PRI Demo" (the "RXO Invoice"). On or around February 2, 2015, Gimaex rejected the RXO Invoice as either an obligation of Gimaex or the Joint Venture. Upon information and belief, the RXO Invoice is for work performed by Spartan USA in procuring a Renault chassis and performing engineering work and cost to develop a running prototype. The work allegedly performed by Spartan USA was never discussed or approved by the Joint Venture's Board of Directors as required under the Agreement, and this work was a cost to be incurred solely by Spartan USA pursuant to the Letter of Intent.

*(c)*   ***Extruded/Glued Body Technology Project***

61. The Extruded/Glued Body Technology Project involved the use of Gimaex's trade secret body construction technology, which does not include conventional methods of welding,

but rather utilizes aluminum extrusions, secured via mechanical methods, as well as structural adhesives.  By utilizing this new technology in the Joint Venture projects, welding is reduced or eliminating, allowing a product to be built with less skilled labor at a faster rate, with a greater emphasis on technology and structural reliability.

62.     The Extruded/Glued Body Technology Project utilizes the thought processes of the Gimaex aluminum extrusion hybrid fastener system and use of adhesives.

63.     The aluminum extrusion hybrid fastener system and use of adhesives were developed and owned by Gimaex.  Gimaex provided this knowledge to Spartan USA for use in the Joint Venture projects, notably the production of the Multi-Function Pumper Aerial 65', further discussed below.

### (d)     Light Duty/Price Point Aerial Project

64.     The Light Duty/Price Point Aerial Project involved the development of the Multi-Function Pumper Aerial 65' (the "MPA65").  The MPA65 is centered on the creation of a product solution that recognizes the low density users of the North American marketplace by providing the Gimaex turntable ladder product with ERV aerial design content at a lower cost. The MPA65 consisted of a Spartan hybrid custom/commercial chassis with a 300-gallon tank, a 1250 GPM pump and a Gimaex 65-foot foot aerial device.

65.     The MPA65, which encompasses all the functions of a pumper, an aerial and a rescue, was manufactured and marketed under the Spartan ERV brand name, with a base price of $350,000.  Pricing for the MPA65, built on a custom chassis, started at $425,000.

66.     To date, Spartan-Gimaex has manufactured one complete MPA65 unit (the "MPA65 1st Unit") and four demos (the "MPA65 Demos," and together with the MPA65 1st Unit, the "MPA65s").

67.     The MPA65 1st Unit was first revealed on or around April 2013 at the FDIC in Indianapolis, Indiana.

68.     During the FDIC, at a meeting held between Gimaex and Spartan USA, Bill Doebler, former Vice President of Sales and Marketing of Spartan ERV, and John Sztykiel, former President and Chief Executive Officer of Spartan Motors, advised Gimaex that the MPA65 Demos needed to be produced and delivered to Spartan by November 2013 in order to be ready for sale in early 2014.

69.     Based on Spartan's statements that the MPA65 Demos needed to be produced immediately and delivered no later than November 2013, Gimaex reallocated its resources and utilized its entire factory in Normandy, France to produce the units and deliver them to Spartan USA by November 2013.

70.     On or around May 2013, Gimaex began developing it components for the MPA65 Demos and provided them to Spartan USA on or around November 2013.

71.     Notwithstanding its obligations to market the MPA65s, and representations to the contrary, Spartan USA did not make any efforts to sell the MPA65s for months, and the MPA65s just sat in Spartan's warehouses.

72.     Upon information and belief, the MPA65 1st Unit is located at Spartan's Brandon, South Dakota facility, and it has a book value of $514,000.  Upon further information and belief, the MPA65 Demos are located at Spartan's Charlotte, Michigan facility, and each has a book value of approximately $154,500.

        *(e)     Emergency Response Platform on Demand*

73.     The Joint Venture also developed and marketed the Emergency Response Platform on Demand ("POD") under the Spartan ERV brand name.  The POD is configured as a

Mobile Command Unit and provides a cost effective, flexible solution for high-risk, low frequency incidents that can impact the response of fire departments, law enforcement, government, military, and public works departments.  The POD equips departments for response to natural disasters, urban search and rescue, mass casualty EMS incidents, hazmat, mobile communications, crime scene incidents and other needs.

74.    The POD was unanimously approved by the Joint Venture Board of Directors.

75.    The Joint Venture has developed one POD prototype, which is located at Spartan's facility in South Brunswick, New Jersey, and it has a book value of approximately $476,000.  Except for Spartan-added context, valued at $60,500, the POD was manufactured by Gimaex and contains all Gimaex components and products.

76.    The POD prototype was showcased on September 12-13, 2014 at the New Jersey Firemen's Association show in Wildwood, New Jersey.  Although customer interest in the POD was high after the show, Spartan did not sell one POD unit.

**C.    Gimaex's Efforts to Promote the Joint Venture Globally Are Thwarted by Spartan**

77.    Prior to the formation of the Joint Venture, Spartan's sales were limited to North America.  In order to promote the Joint Venture's capabilities, Gimaex would (and did) provide Spartan with access to its dealer networks worldwide, including South America.

78.    Specifically, Gimaex provided Spartan with access to its dealer network in Brazil.  On or around June 1-2, 2012, Gimaex introduced Spartan to the Chief of the Sao Paulo Fire Department and Gimaex's dealer in Brazil, so that Spartan could enter the Brazilian market and increase its global footprint and further promote the Joint Venture.

79.    In Brazil, the sale of fire vehicles is controlled by an open auction and live bidding process, whereby parties must tender an offer in response to the bid.

80.     After Gimaex introduced Spartan to its dealer, the Fire Chief of Sao Paulo, and the entire bidding process in Brazil, Spartan shut Gimaex out by not including Gimaex in its bidding process, even though its bid had incorporated Gimaex's technology, the One Seven® Compressed Air Foam System (CAFS).  One Seven is a highly efficient extinguishing system that can be used for the effective, safe and fast extinguishing of all kind of fires.

81.     Despite Gimaex's request that the parties discuss pricing prior to the tender of its bid, Spartan did not discuss pricing with Gimaex of the One Seven CAFS, stating that the issue of pricing could be determined after the tender.

82.     On or around August 29, 2014, Spartan did, however, request that Gimaex reduce its cost of One Seven CAFS per vehicle in order to meet the tender price.  Gimaex was unable to do so without incurring significant losses.

83.     Then, on or around September 16, 2014, after Spartan submitted its bid without input from Gimaex, Spartan was awarded the tender of the Sao Paulo bid for twenty Spartan ERV custom pumpers, which were supposed to incorporate Gimaex's One Seven CAFS.

84.     Because Spartan failed to communicate with Gimaex throughout the process and Gimaex could not reduce the costs of its product, Spartan was required to use its own inferior product, thereby creating a situation where Spartan would be competing with Gimaex in a market in which Spartan only had access to because of Gimaex, and the Sao Paulo Fire Department (with whom Gimaex had a long and significant relationship) would not get a product with Gimaex's technology.

85.     Spartan's actions were in contravention of the spirit of the Agreement and the purpose of the Joint Venture, which was to work collaboratively to promote and sell not only the Joint Venture Projects, but other Spartan and Gimaex products to certain market segments.

**D.      Defendant Breaches the Joint Venture Agreement**

86.      At the time of the formation of the Joint Venture, Spartan USA did not advise Gimaex of its financial decline nor of its unrest, discord, and turnover in its executive management team.  Indeed, according to Spartan Motors' annual statement and public filings, Spartan Motors reported an operating loss of approximately $2.6 million in 2012, $8.2 million in 2013, and $1.2 million in 2014.  Of these operating losses, approximately $3 million in 2012, $7.7 million in 2013 and $7 million in 2014 were attributed to Spartan ERV.  Spartan contributed the significant losses in 2013 in large part to goodwill impairment charges.  Upon information and belief, Spartan USA's financial discord caused its inability to pursue its obligations under the Agreement.

87.      On February 19, 2015, John Sztykiel, who had been with Spartan for approximately 30 years, retired as Spartan Motors' President and Chief Executive Officer.  Over the past several months, there was a revolving door of executives at Spartan.  Indeed, as explained above, the internal turmoil and changes in the executive management of Spartan further caused the directors appointed by Spartan USA to continually change.

88.      Under the Agreement, Spartan was required to provide notice of any changes to its designated Board of Directors to the Joint Venture, Gimaex and the Board of Directors.  *Id.* ¶ 5.05(b).  However, Spartan failed to provide Gimaex with any notice of its changes.  As a result, Gimaex is uncertain at this time as to whom Spartan has designated as representing its interest on the Board of Directors.

89.      In order to facilitate the management of Spartan-Gimaex, the Agreement provides that the Board of Directors is required to meet four times each fiscal year, unless the Board of Directors agreed otherwise.  *Id.* ¶ 5.05(a).  However, Spartan USA designated directors

repeatedly and unilaterally cancelled the board meetings, making management and pursuit of the Joint Venture's goals and projects difficult.  Indeed, the last Joint Venture board meeting held was on April 10, 2014 at the Conrad Hotel, Indianapolis.

90.     In reaching the Agreement, the parties agreed that Spartan USA would provide monthly financial reporting to Gimaex regarding the Joint Venture.  Spartan USA, however, failed to timely, and in a regular manner, provide monthly financial statements to Gimaex.

91.     Spartan USA further failed to market and promote the Joint Venture Projects and capabilities to Spartan's dealer networks in United States and Canada.  Spartan also shut Gimaex out and limited Gimaex's access to its dealer networks.  For example, Gimaex was not invited to Spartan's dealer advisory council meetings or any roadshows where the Joint Venture products were showcased, which would have permitted Gimaex, which was familiar with the technology, to properly showcase the products.

92.     As such, in order to further promote the capabilities of the Gimaex technology and promote the Joint Venture Project, Gimaex invited Spartan's top dealers to Jupiter, Florida, on December 10-12, 2013.

93.     At the meeting, it became apparent that Spartan USA had not promoted Gimaex's technology or the Joint Venture Products as the dealers had little (or no) knowledge of the products and their capabilities.  For example, the top dealers had never seen a demonstration of the MPA65 and its capabilities, despite the MPA65 prototype being complete since April 2013.

94.     Nonetheless, on or around March 12, 2015, Spartan claims, incorrectly, that as of December 31, 2014, it has incurred expenses in the amount of $376,372 for "marketing," with $152,821 attributed to the MPA65.

### E.      The Dissolution of the Joint Venture

95.      Under the Agreement, a party has the right to terminate the Agreement and dissolve the Joint Venture in the event of a deadlock in voting on any matter presented to the Joint Venture's Board of Directors or upon unanimous approval by the Board of Directors.   *Id.* ¶¶ 2.03, 5.06.

96.      In the event of a deadlock, the Agreement provides that a party may seek to break the deadlock by initiating the following procedure.   A party initiates the deadlock breaking procedures by submitting a notice of deadlock (the "Deadlock Notice") to the other party, providing a description of the issues and a proposed resolution.   *Id.* ¶ 5.06(d).   Within 10 business days after delivery of the Deadlock Notice, Spartan USA and Gimaex must each designate a senior management officer in it or an affiliate who is familiar with the Joint Venture and authorized and empowered to resolve the dispute.   *Id.* ¶ 5.06(d)(i).   Within 30 days after the delivery of the Deadlock Notice, the designated officers will hold a meeting and use commercially reasonably efforts to determine and provide for the action that would be necessary to resolve the reason for the deadlock.   *Id.* ¶ 5.06(d)(ii).   If the designated officers are unable to come to a resolution, a party may, after 10 days of the meeting, provide the other party with notice that it has elected to cause the Joint Venture to be dissolved.   *Id.*   The Board of Directors will then dissolve the Joint Venture and wind up its business and affairs as expressed in Article XII of the Agreement.   *Id.*

97.      Article XII of the Agreement provides the procedures for winding up, liquidating and distributing the assets of the Joint Venture upon dissolution, and authorizes the Board of Directors to take certain actions.   *Id.* ¶ 12.02.

98.     The Agreement provides that, upon dissolution of the Joint Venture, an accounting shall be made of the accounts of the Joint Venture and of the Joint Venture's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution, by an independent accountant reasonably acceptable to the parties.  *Id.* ¶ 12.02(a).

99.     The Board of Directors is further directed with authority to wind up the affairs of the Venture, including: (1) selling or otherwise liquidating the Joint Venture's assets, as may be required to discharge all liabilities of the Joint Venture, and establishing reserves as may be reasonably necessary to provide for contingent liabilities of the Joint Venture; (2) paying creditors, including Gimaex and Spartan USA, but excluding amounts described as Costs[2]; and (3) distributing the remaining assets in the following priority: (a) payment of Costs, pro rata between the parties, (b) payment of Unrecovered Ordinary Capital,[3] pro rata between the parties, (c) in accordance with positive balances in the parties' respective Capital Accounts[4] until such balances shall have been reduced to zero, and (d) to the parties, pro rata in accordance with their Sharing Ratios.  *Id.* ¶ 12.02(b).

100.    The Agreement does not provide a mechanism for resolving a deadlock among the Board of Directors regarding the wind down process.

101.    Despite Gimaex's best efforts, the Joint Venture has not achieved any of its goals and has not approached any of its projections for each of its projects.

---

[2] Under the Agreement, "Cost" is defined as "the costs incurred by a Venturer in delivering Content to the Venture as required in a Project Plan, as determined in accordance with Exhibit J, plus 3% mark-up, as determined in accordance with Exhibit J.  *See* Ex. 1 (Agreement) at Exhibit B.

[3] Under the Agreement, "Unrecovered Ordinary Capital" is defined as "with respect to a Venturer, the amount determined for each day of a particular Fiscal Year of its Ordinary Capital which has not been repaid."  *See* Ex. 1 (Agreement) at Exhibit B.

[4] Under the Agreement, "Capital Account" is defined as the "Capital Contribution to the Venture by a Venturer as adjusted up to such date pursuant to Article VII."  *See* Ex. 1 (Agreement) at Exhibit B.

102.     The Board of Directors was also unable to function because Spartan USA had unilaterally cancelled several meetings, and the members of the Board of Directors designated by Spartan refused to meaningfully address the non-viability of the projects.

103.     On or around February 5, 2015, Gimaex deemed the Joint Venture terminated as a result of the parties being deadlocked, and Spartan USA failed to participate in a timely manner in the deadlock procedures initiated by Gimaex set forth under paragraph 5.06 of the Agreement. Specifically, Spartan USA, in breach of the Agreement, failed to designate a senior management officer or an affiliate who is familiar with the Joint Venture and authorized and empowered to resolve the dispute within 10 business days.

104.     On or around, February 19, 2015, the Joint Venture was dissolved by mutual consent.  Pursuant to paragraphs 2.03 and 5.06(b)(viii) of the Agreement, the Board of Directors of the Joint Venture determined that it was in the best interest for the Joint Venture to be dissolved and its activities wound up.  The Board of Directors further resolved that all actions to be taken to dissolve and wind up the affairs of the Company and all other material terms of such plan of dissolution are subject to further approval by the Board of Directors in accordance with the Agreement.

105.     During the dissolution process, Gimaex and Spartan USA discussed the disposition of the Joint Venture assets and wind-up approach.

106.     On or around January 16, 2015, Gimaex proposed the Joint Venture strongly consider selling some or all of the Joint Venture products to Smeal Fire Apparatus Co. ("Smeal").  In the alternative, Gimaex proposed that the Joint Venture products be disassembled and returned to their original supplier, Gimaex or Spartan USA as the case may be.

107.    On or around January 19, 2015, Spartan USA stated that it believed that disassembling all Joint Venture products and returning their components to the original supplier would be the prudent approach.  Spartan USA further advised that it would identify the steps necessary and the costs associated with disassembling the Joint Venture products.

108.    On or around January 27, 2015, due to the disassembly of the products being very expensive and to further generate some return for the Joint Venture, Gimaex proposed the Joint Venture consider its prior proposal to sell all or most of the Joint Venture products to Smeal, which had already made an offer to purchase the MPA65s.  Spartan USA, however, advised that it would prefer to disassemble the inventory and return its components to each member of the Joint Venture.

109.    On or around February 25, 2015, Spartan USA provided Gimaex with an inventory and book value of the Joint Venture's assets, as of December 31, 2014 (the "Inventory").  As of December 31, 2015, the Joint Venture's inventory consists of the MPA65s, Telstar, POD, and RXO (the "Joint Venture Assets").  The Joint Venture Assets are in the possession and control of Spartan USA.

110.    Spartan USA is further in possession of Gimaex's aerial unit, which, upon information and belief is in Spartan's facility in Ephrata, Pennsylvania (the "Aerial").  Spartan has admitted that the Aerial belongs to Gimaex and is not a Joint Venture asset or related to the Joint Venture in any way.

111.    On or around February 25, 2015, Spartan USA provided Gimaex with a balance sheet for the Joint Venture, as of December 31, 2014, which showed total liabilities and equity in the amount of $2,468,656.54 (the "Balance Sheet").

112.    On or around February 25, 2015, Spartan USA provided Gimaex with a profit and loss statement for the Joint Venture, as of December 31, 2014, which showed net income of $235,000.00 (the "Profit and Loss Statement").

113.    On or around February 27, 2015, Gimaex again rejected the RXO Invoice as either an obligation of Gimaex or the Joint Venture, and Spartan USA listing it as an account receivable.  Gimaex further requested that Spartan: (1) send Gimaex's Aerial apparently located at Spartan's facility in Ephrata, Pennsylvania, to Smeal in Nebraska; (2) return immediately to Gimaex all components currently held by Spartan USA or the Joint Venture that have not been incorporated in any Joint Venture inventory; and (3) send the POD immediately to Gimaex.

114.    On or around March 4, 2015, Spartan USA agreed that the Aerial was the property of Gimaex and agreed to coordinate its pick up.  Spartan USA further stated that, with respect to the POD, it believed that Gimaex's pick-up/return of the POD, including $60,500 of Spartan-added content, would be the best disposition of the asset.  Spartan USA further proposed selling the Freightliner Chassis and Lift System, which is part of the POD, with a Joint Venture book value at $120,000, and that the difference between the sales and book value be shared 50/50 between the parties and adjusted on the Balance Sheet.  Spartan USA also proposed that the MPA65 units and Telstar be disassembled, with each partners' equipment returned to its respective contributor.  Spartan USA stated that it would perform the disassembly of the units and charge each party 50% for the labor to disassemble and scrap of unusable material and assembly labor.  With respect to Gimaex's proposal that the MPA65s be sold to Smeal, Spartan USA stated that it would need additional information regarding warranty and indemnification in order to review the proposal.

115.     On March 5, 2015, Gimaex informed Spartan USA that, with respect to the sale of the MPA65s to Smeal, Gimaex would stand behind its components and Spartan USA would be expected to stand behind its components.

116.     On or around March 25, 2015, Spartan USA provided an estimate of the time and cost to disassemble the MPA65s.  Spartan USA estimated 150 hours to disassemble each of the four MPA65 Demos and 250 hours to disassemble the MPA65 1st Unit due to additional content, at a rate of $78.61 per hour, for a total cost of $668,185.

117.     After the parties agreed to dissolve the Joint Venture, the parties have attempted to confer regarding the winding up of the Joint Venture's affairs and disposition of the Joint Venture's assets, but the Board of Directors is deadlocked and cannot come to an agreement on how best to wind down the Joint Venture.

118.     The Agreement does not provide a mechanism for breaking this deadlock.

## CLAIMS FOR RELIEF

**COUNT I:  APPOINTMENT OF A LIQUIDATING TRUSTEE/RECEIVER**

119.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

120.     The parties have jointly agreed to the dissolution of the Joint Venture.  The parties are deadlocked, and they are unable to agree as to the winding up, liquidation and distribution of assets of the Joint Venture.

121.     There is no procedure in the Agreement for resolving such deadlock.

122.     The Court should appoint a trustee or receiver to wind-up the Joint Venture's affairs and liquidate the Joint Venture's assets.  This approach would be more equitable than the

deadlocked status quo, in which Spartan USA continues to possess Gimaex's technology and products, and a reasonably prompt liquidation cannot be achieved.

123.    For the foregoing reasons, and pursuant to 6 *Del. C.* § 18-803, federal law, and equity, Plaintiff is entitled to an order appointing a trustee or receiver to liquidate and wind-down the affairs of the Spartan-Gimaex and liquidate the Joint Venture's assets.

## COUNT II:  CONVERSION

124.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

125.    Spartan USA is in the possession of certain property belonging to Gimaex, which are not Joint Venture assets, including component parts that have been delivered to Spartan USA and incorporated into the MPA65s and Telstar, certain component parts that have been delivered to Spartan USA but not yet incorporated into any Joint Venture Projects, the POD and Aerial (the "Gimaex Property").

126.    Despite Plaintiff's repeated demands for the return of the Gimaex Property, the Gimaex Property has not been delivered to Plaintiff, thereby depriving Plaintiff of its right to possess its property.

127.    As a direct and proximate result of Spartan USA's unauthorized assertion of dominion and control over the Gimaex Property, Plaintiff has suffered, and continues to suffer, damages in an amount to be proven at trial.

## COUNT III:  BREACH OF CONTRACT

128.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

129.    As set forth herein, on or about November 8, 2012, Gimaex and Spartan USA entered into a written and legally binding joint venture agreement.

130.    Under the Agreement, Spartan USA and Gimaex were each required to "proceed with diligence to provide the services and materials required of them and will continuously support the Project, subject to the terms and conditions of the related Project Plan."  Ex. 1 (Agreement) at ¶ 3.01(d).

131.    Gimaex fully performed under the Agreement by producing and supplying its component parts for the Telstar, RXO and MPA65s as required under the Agreement.

132.    Spartan USA breached the Agreement by failing to use diligence in marketing and promoting the Joint Venture Projects as required under Paragraph 3.01 of the Agreement.

133.    As a direct and proximate result of Spartan USA's material breaches of the Agreement, Gimaex has suffered, and continues to suffer, damages in an amount to be proven at trial.

## COUNT IV:  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

134.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

135.    As set forth herein, on or about November 8, 2012, Gimaex and Spartan USA entered into a written and legally binding Joint Venture agreement.

136.    Inherent in every agreement is the implied covenant of good faith and fair dealing.

137.    Section 4.05 of the Agreement provides that Spartan USA and its officers, directors, employees and agents are liable for "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."  *See* Ex. 1 (Agreement) at ¶ 4.05.

138.     Section 3.01 of the Agreement identifies that the purposes of the Joint Venture is to "identify and bring products to market segments for Venture profit by application of the Venturer's expertise." *Id.* ¶ 3.01.  It was understood by all parties that in order for Gimaex and Spartan USA to achieve this goal the parties would work collaboratively and provide each other access to its dealer networks.  Specifically, in the North American markets, Spartan USA would promote the Joint Venture Projects to its dealers in North America.

139.     Spartan USA, directly and/or indirectly through its managers, officers, members, employees, representatives and/or agents, breached the covenant of good faith and fair dealing by (a) failing to undertake good faith, commercially reasonable efforts to sell the Joint Venture Projects; and (b) refusing to sell the Telstar to a Canadian buyer in order to advance Spartan USA's interests over the interests of the Joint Venture.

140.     The acts and omissions set forth herein are alleged to have been taken to enrich Spartan USA to the detriment of the Joint Venture.  As such, these acts and omissions were taken in bad faith and without regard for the best interests of the Joint Venture and, accordingly, constituted bad faith violations of the implied covenant of good faith and fair dealing.

141.     As a direct and proximate result of Spartan USA's breach of the covenant of good faith and fair dealing, Plaintiff has suffered harm, including, but not limited to, monetary damages, in an amount to be determined at trial.

## COUNT V:  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

142.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

143.     Gimaex had a long and significant business relationship with the Sao Paulo Fire Department and its Chief.  Spartan USA was well aware of this business relationship.

144.   Upon information and belief, despite their knowledge of this business relationship, Spartan USA intentionally interfered with this relationship by excluding Gimaex from the above-mentioned bidding process, not using the Gimaex technology on the product, and creating a situation where Spartan would be competing with Gimaex in a market in which Spartan only had access to because of Gimaex, as well as the Sao Paulo Fire Department not getting a product with Gimaex's technology.

145.   Spartan USA's interference caused and continues to cause damage to Gimaex.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendant and for the Court to enter an Order as follows:

A.   Appointing a trustee or receiver with full power and authority to wind-down the affairs of Spartan-Gimaex;

B.   Ordering an accounting;

C.   Directing and approving the disposition or sale of Spartan-Gimaex's assets in a manner that optimizes their value;

D.   Directing and approving the distribution of any proceeds in a manner that complies with the Agreement and Delaware law;

E.   Awarding damages against Defendant in an amount to be determined at trial;

F.   Awarding legal fees and costs, including attorneys' fees, to Plaintiff pursuant to paragraph 13.10 of the Agreement and Delaware law;

G.   Awarding pre- and post-judgment interest; and

H.   Awarding such other and further relief as this Court deems just and proper.

Dated:  June 19, 2015

Respectfully submitted,

REED SMITH LLP

*/s/ Brian M. Rostocki*
Brian M. Rostocki (No. 4599)
Diana Rabeh (No. 5790)
1201 Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
Fax:  (302) 778-7575
brostocki@reedsmith.com
drabeh@reedsmith.com

*Counsel for Plaintiff Gimaex
Holding, Inc.*

OF COUNSEL:

Mark S. Melodia
REED SMITH LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022
Telephone: (212) 205-6078
Fax: (212) 521-5450
mmelodia@reedsmith.com